[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10860
Non-Argument Calendar
_____

D.C. Docket No. 6:18-cr-00059-GAP-GJK-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEVIN LASHAWN JEFFERSON, II,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 4, 2020)

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

PER CURIAM:

Devin Jefferson II appeals his conviction for attempted possession of furanyl fentanyl with intent to distribute.  He contends that the district court should have granted his motion for a new trial because it allowed a federal agent to offer lay opinion testimony about drug prices in China.

I.

This case began when Customs and Border Protection (CBP) inspected a package from Hong Kong as it entered the United States and found that it contained more than a kilogram of furanyl fentanyl.[1]  The package was addressed to a house in Apopka, Florida.  In February 2018 Homeland Security Investigations Special Agent Robert Palfrey began investigating the package.  He searched for the Florida address in a driver's license database and found that it was associated with three people: Jefferson and his two grandparents.  The recipient named on the package was Jefferson's grandmother.

Agent Palfrey subpoenaed records from Western Union, and they showed Jefferson had sent 17 payments to China between February and December of 2017.  Most of those payments were sent to the same recipient, a "Songshou Xu."  The

---

[1] There is no evidence in the record about when the package was intercepted.  In its opening statement and closing argument at trial, the government said that the package had been seized in April 2017.  The record shows that the contents were tested in August 2017.  In any event, none of the issues turn on when the package was intercepted.

payments varied in amount from $400 to $2,500.  There were no payments sent to China by either of Jefferson's grandparents.

With the help of other federal agents, Palfrey attempted a controlled delivery to the Florida address.  The agents used a dummy package that contained a kilogram of baking soda and an electronic alarm that would alert them if the package was opened.  The alarm would be visible to anyone who opened the box.  A postal inspector dressed as a mail carrier brought the package to the house, where Jefferson's grandfather accepted delivery of it.  After about five minutes, the agents gave up on waiting for the package to be opened.  They searched the house pursuant to a warrant that they had obtained in advance.  Inside the house they found the unopened package and some mail addressed to Jefferson, but Jefferson himself was not there.  The agents spoke to the grandfather, who agreed to cooperate.  He called Jefferson and told him that a package from China had arrived for him.  Jefferson drove to the house, picked up the package from the front porch, returned to his car, and drove away.  Palfrey and another agent followed him.

While the agents were tailing Jefferson, they received an alert that the dummy package had been opened.  They turned on their emergency lights in an attempt to stop Jefferson, but he fled at speeds of more than 100 miles per hour.  For safety reasons, the agents did not chase him — there were school buses unloading and children walking around nearby.  About half a mile down the road

the agents found the box from the dummy package. The baking soda was not inside of it and was not found anywhere nearby. About 10 to 20 minutes later, they did find the Nissan that Jefferson had been driving abandoned on the side of the road. Jefferson was arrested two weeks later.

## II.

Jefferson was indicted on two counts but went to trial on only one: attempting to possess with intent to distribute furanyl fentanyl, in violation of 21 U.S.C. § 846 and § 841(b)(1)(C).[2] The other count was later dismissed.

At trial Agent Palfrey and other witnesses testified about the facts of this case as we have described them. During his testimony, the government asked Palfrey about the significance of the Western Union payments, particularly the amounts of the payments. When Palfrey tried to offer an opinion about what the amounts indicated, Jefferson objected. He argued that the government had failed to lay the proper foundation for Palfrey's opinion testimony under Federal Rule of Evidence 701.[3] The government agreed that it was offering his testimony under

---

[2] Under § 846, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense." The indictment in this case did not cite the underlying substantive offense, but at trial the government clarified that it was 21 U.S.C. § 841(a)(1).

[3] Rule 701 governs opinion testimony by lay witnesses. It provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) rationally based on the witness's perception;

4

Rule 701 but argued that the foundation it had laid was sufficient. The court agreed with the government and overruled Jefferson's objection.

Palfrey then testified that the smaller payments were consistent with someone ordering small shipments of synthetic drugs to test the quality of the product. The larger payments, he said, were consistent with purchases of larger quantities of product or higher-quality product. According to Palfrey, the average price of a kilogram of synthetic drugs from China at the time was between $2,000 and $3,000. Jefferson's eight largest payments were within that range. A few of the payments were somewhere in the middle — more than $1,000 but less than $2,000. Palfrey explained based on his own experience with making undercover purchases that drug distributors in China reward their repeat customers by offering them special discounts. He also explained that it is common for people who buy

---

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 702 governs opinion testimony by expert witnesses. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

drugs from China to pay for them through Western Union and that it usually takes six to eight weeks to receive a package of drugs from China after ordering it.

At the end of trial, the jury found Jefferson guilty.  He moved for a new trial, arguing that the district court had erred by allowing Palfrey to testify under Rule 701 instead of Rule 702.  The district court granted the motion.  It ruled that Palfrey's testimony about the price of drugs sold in China violated Rule 701(c) because it was based on knowledge gained from other investigations instead of this one.  And the court found that because Palfrey's testimony was a key part of the government's case the error in admitting it was prejudicial.

The government filed a motion to reconsider.  It argued that Palfrey's testimony was admissible under Rule 701, and that even if it was not, any error did not prejudice Jefferson because the government had met the notice requirements for a Rule 702 expert.  The district court granted the motion to reconsider and vacated the order granting a new trial.  Although the court still thought that it was error to allow Palfrey to testify under Rule 701, it found that the error did not prejudice Jefferson.

### III.

Jefferson contends that the district court erred by denying his motion for a new trial.  Federal Rule of Criminal Procedure 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires." We review a denial of a motion for a new trial only for an abuse of discretion. United States v. Russo, 717 F.2d 545, 550 (11th Cir. 1983). We also review the district court's evidentiary rulings only for an abuse of discretion. United States v. Khan, 794 F.3d 1288, 1293 (11th Cir. 2015). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Id. (quotation marks omitted). Or if it makes a clear error in judgment. United States v. Brown, 415 F.3d 1257, 1266 (11th Cir. 2005).

We need not decide whether the district court erred by admitting Palfrey's testimony under Rule 701. Even if the court did err in doing so, the asserted error is harmless and did not warrant a new trial. "In evaluating whether specific trial errors warrant a new trial, we apply the harmless-error standard[.]" United States v. Jeri, 869 F.3d 1247, 1259 (11th Cir. 2017); see Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The asserted error is a non-constitutional one and, like constitutional errors, it is subject to harmless error review. See Khan, 794 F.3d at 1299; see also Arizona v. Fulminante, 499 U.S. 279, 306–07 (1991) (explaining that "most constitutional errors can be harmless").

The government bears the burden of establishing that an error is harmless. United States v. Sweat, 555 F.3d 1364, 1367 (11th Cir. 2009). But it doesn't have

7

to prove harmlessness beyond a reasonable doubt for this type of error. Instead, "[t]he government meets its burden for a non-constitutional error when we are convinced that the error did not affect the verdict or had but very slight effect; we review the trial record in its entirety when making the determination of harmless error." Id. (quotation marks omitted).

Jefferson's main argument on harmfulness is that if Palfrey's opinion testimony had been excluded, the Western Union records would have been irrelevant and therefore inadmissible, and without them there would have been "little or no evidence that [he] had knowledge that the package he was picking up was supposed to contain furanyl fentanyl."

Jefferson is wrong in two ways. First, even without Palfrey's opinion testimony, the Western Union records would have been relevant. Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). The fact that Jefferson wired substantial amounts of money to China in 2017 made it more likely that he intended to receive the package of furanyl fentanyl from China.[4] Excluding Palfrey's opinion testimony would not have led to the records being excluded as irrelevant. They still would have been admitted.

---

[4] Jefferson argued at trial that it is possible the money transfers were for counterfeit Chinese goods and not drugs. But that possibility does not make evidence regarding the transfers irrelevant. It goes to the weight to be given the evidence, not to its admissibility.

And second, there was plenty of other evidence at trial showing that Jefferson believed he was taking possession of furanyl fentanyl when he picked up the dummy package. The package that CBP intercepted was addressed to Jefferson's grandparents' house and contained more than a kilogram of furanyl fentanyl. Jefferson's grandmother was named as the recipient on the package, which means that the Chinese drug supplier did not send the package to the wrong house by mistake. If there had been a typo or other error on the address label, the name on the label would not have matched one of the address's actual residents, but it did. And there was other mail addressed to Jefferson inside his grandparents' house, showing that he received some of his mail there.

Jefferson's actions shed additional light on his state of mind and knowledge. He readily picked up the dummy package after his grandfather called to tell him about it. Alerted that Jefferson had opened the package in his car, federal agents tried to pull him over. Instead of stopping, Jefferson sped away at over 100 miles per hour as school buses unloaded children nearby. Cf. United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992) ("Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt."). He threw away the box and the electronic alarm but not the substance inside, and he abandoned his car on the side of the road as he fled. All of those facts, when combined with the Western

9

Union records, provided overwhelmingly proof that Jefferson intended to possess furanyl fentanyl.

Of course, in the prosecution of an attempt crime the government must prove not only intent but also a "substantial step" strongly corroborating the defendant's intent.  See United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001). That element was satisfied when Jefferson took possession of the dummy package and then fled after the agents tried to pull him over.  Those actions — particularly Jefferson's flight — were "strongly corroborative of [his] criminal intent."  Id.; cf. United States v. Williams, 603 F.2d 1168, 1174 (5th Cir. 1979) (finding that the defendants' acts, including their "evasive driving" after receiving a controlled delivery of PCP precursor chemicals, were substantial steps that supported their attempt convictions).[5]

The only testimony offered by the defense was from a seventeen-year-old eyewitness who saw Jefferson's car as it was being abandoned on the side of the road.  He testified that the person who got out of the car was wearing light-colored clothes, although he admitted that he could not see the person clearly.  That testimony is at odds with Agent Palfrey's testimony that Jefferson's clothing was dark-colored.  But that difference does not undermine the strong proof that

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

10

Jefferson was in fact the person who picked up the package and fled from the police. Jefferson showed up to get the package after his grandfather called to tell him about it; both Palfrey and another agent positively identified the man who arrived and got the package as Jefferson based on his driver's license photo; and at one point while they were following the car, the agents pulled up next to it and were able to see that Jefferson was the driver and no one else was in it.

Because there was overwhelming evidence at trial proving Jefferson's guilt, we are convinced that Palfrey's opinion testimony did not affect the verdict. Any error the district court might have made by admitting the testimony was harmless. See United States v. Willner, 795 F.3d 1297, 1322 (11th Cir. 2015) (holding that the district court's error in allowing a witness to give expert testimony was harmless because of "the overwhelming evidence of the [defendants'] guilt as charged in the indictment"). As a result, the district court did not abuse its discretion by denying Jefferson's motion for a new trial.[6]

**AFFIRMED.**

---

[6] Jefferson also asserts that if Palfrey had been designated as an expert under Rule 702, the government would have been required to disclose a written summary of Palfrey's testimony under Federal Rule of Criminal Procedure 16(a)(1)(G). He argues that the lack of a written summary hindered his defense because he was unable to move before trial to exclude Palfrey's opinion testimony under Rule 702 and was unable to hire his own expert to rebut Palfrey's opinions. Because we are convinced that Palfrey's opinion testimony did not affect the verdict, we need not address those arguments. See United States v. Barragan, 793 F.2d 1255, 1259 (11th Cir. 1986) (holding that the government's Rule 16(a) violation was harmless because the defendant's "participation and role in the crime were clearly established" by other evidence at trial)